KIRBY, Respondent, v. FIRST NATIONAL BANK OF VERMILLION, Appellant.

(266 N. W. 883.)

(File No. 7850.   Opinion filed April 24, 1936.)

*Gunderson & Gunderson,* of Vermillion, and *Max Royhl,* of Huron, for Appellant.

*W. A. Bauman,* of Vermillion, and *Danforth & Davenport,* of Sioux Falls, for Respondent.

WARREN, J.   This is an action for damages for procuring the issuance of an attachment and levy thereunder without probable cause and with malice.   It seems to be founded upon the principles found in the case of Slaughter v. Nolan et al., 41 S. D. 134, 169 N. W. 232.   The action is not upon the attachment bond, but is rather in the nature of a suit to recover damages for malicious prosecution.

The plaintiff herein successfully defended against the attachment proceedings in this court in First Nat. Bank v. Kirby, 62 S. D. 489, 253 N. W. 616.   The facts therein disclose the foundation of the proceedings in the present case.   This court in that opinion held that the order dissolving the attachment on the merits was conclusive and that the order made setting aside and releasing the attachment become final, and that the granting of a rehearing of that order was of no force and effect.

The question on this appeal seems to be whether or not there was sufficient evidence on the question of probable cause to justify

its submission to the jury. Attachment is an extraordinary reme-
dy, and, if recklessly used, there is grave danger of damaging the
party and property against whom the writ of attachment is di-
rected. It would seem that the reason for the giving of the bond
provided for by statute is to secure against the reckless issuing of
this extraordinary remedy. However, in this case, the plaintiff
has not proceeded by a suit for damages under the bond, but has
proceeded under the theory of Slaughter v. Nolan et al., supra,
and predicated his action on malice and want of probable cause.
An examination of the record indicates a fair and impartial trial.
The rulings of the trial court on the admission and rejection of
evidence were not prejudicial. The instructions to the jury were
fair, clear, and concise, and clearly stated the law upon the theory
that the case was tried.

We have examined the evidence carefully in order to deter-
mine the question of whether there was probable cause for issuing
the attachment on the grounds alleged in the affidavit. We be-
lieve that, in the light of the record, it was a question for the
jury. It was not a question of whether there was in fact legal
grounds for an attachment, but rather one of good faith by the
officers of the defendant bank. Courts and text-writers differ as
to the meaning of the term "probable cause." This court has on
previous occasions expressed its views thereon, which have a direct
bearing upon the issues before us. In deciding the peculiar facts
before us, we believe that the author of the monographic note in
Michael v. Matson, 81 Kan. 360, 105 P. 537, found in L. R. A.
1915D, at page 3, very aptly states the rule of law which should be
applied to the facts in this case, as follows:

"Probable cause being thus so essentially a question of fact,
and such questions being, under our system of jurisprudence, so
properly for the determination of the jury, rather than the judge,
who, as a rule is to determine only questions of law, it would
seem, therefore, that the question of probable cause is naturally and
logically a question for the determination of the jury. If it is not
so determined, its position in our system of laws is plainly ano-
malous,—a thing which should not be without good and substantial
reason. It is the theory of our law, and the practice generally,
that twelve jurymen, themselves presumed to be reasonable men,

are better fitted to decide what was the proper conduct for a reasonable man in a particular case than the judge, as the question is: what would a reasonable or ordinarily prudent man have done under the circumstances; and not what one learned in the law, as the judge is supposed to be, would have done. And as has already been noticed, it is just this question of the proper conduct of a reasonable man that is involved in the determination of the question of probable cause."

In a suit for damages for wrongful levy of attachment, in Slaughter v. Nolan et al., supra, this court held that the court did not err in refusing to direct a verdict, and said: "The trial court did not err in refusing to direct a verdict, yet whether there was sufficient evidence to prove malice and want of probable cause was a question that should have been left for the decision of the jury, unless respondent's further contention is sound—an action, not upon the attachment bond, will lie for a wrongful attachment even though there was probable cause for the attachment or even though the attachment creditor was not actuated by malice in causing the attachment."

In Jackson v. Bell, 5 S. D. 257, 58 N. W. 671, we held that conflicting evidence as to probable cause should be tested and determined by the jury under proper instructions as to what facts if they existed, constituted probable cause. We think it was a jury question in this case.

The question of consulting and seeking the advice of counsel is presented. We have therefore examined the record, and it appears that the attorney consulted was a director of the defendant bank and its general attorney. In Larson v. Johnson, 43 S. D. 223, 178 N. W. 876, we held that questions as to the extent of a party's communication to counsel of all the facts were questions to be determined by the jury. See Shong v. Stinchfield et al., 47 N. D. 495, 183 N. W. 268. In L. Bucki & Son Lumber Co. v. Atlantic Lumber Co. (C. C. A.) 121 F. 233, 245, the court considered the advice of counsel in suing out an attachment where the counsel was a director and secretary of the defendant's company, and held that on account thereof the issue of malice became peculiarly one for the jury, and we quote: "We understand that the question of advice of counsel in instituting and prosecuting a

suit goes to affect the question of malice, which, in suits of this kind, is a question for the jury; but in relation to this particular case we deem it proper to say that the question was one particularly for the jury, because the counsel whose advice was alleged to have been given and taken was a director and secretary of the lumber company, and it is, to a certain extent, the question of a person advising himself in his own interest. We think it reasonably clear that a lawyer 'learned in the law' cannot advise himself as to the right and propriety of suing out an attachment, and, when prosecuted for suing it out maliciously, rebut all malice by showing that he advised himself. As to the effect to be given to the advice of interested counsel, see Watt v. Corey and Ricken, 76 Me. 87; Charles City Plow & Manufacturing Co. v. Jones & Co., 71 Iowa, 234, 238, 32 N. W. 280." See Wuest et al. v. American Tobacco Co., 10 S. D. 394, 73 N. W. 903; Watt v. Corey, 76 Me. 87, and Hearn v. Batchelor, 47 Ga. App. 213, 170 S. E. 203.

We think there was a jury question in this case, and we see no useful purpose in commenting on and setting forth the evidence which we think is sufficient to sustain the verdict. We have carefully examined all of the alleged errors, but are of the opinion that there is no prejudicial error in the record, and that the appellant had a fair and impartial trial.

The order and judgment appealed from are affirmed.

CAMPBELL and ROBERTS, JJ., concur.
POLLEY, P. J., and RUDOLPH, J., dissent.

POLLEY, P. J. (dissenting) I am not able to concur in Judge WARREN'S opinion in this case. There was not only probable cause, but there was ample cause for suing out the attachment.

Plaintiff operated a men's furnishing store in Vermillion from some time about 1919 until the 28th day of May, 1932, when the attachment was levied on his stock of merchandise. At or about the time plaintiff commenced business in 1919 he borrowed $5,000 from the Vermillion National Bank. This bank went out of business in 1929, and the defendant, First National Bank, became the owner of the note, which by that time had been reduced by payments thereon to $2,500.

Payments sufficient to take care of the interest were made

through 1931. From 1919 to 1932 plaintiff, Kirby, from time to time, made and delivered to the owner of the note property statements showing the state of his business. During the first years of his business he appears to have carried a stock of merchandise valued at more than $20,000, with annual sales running as high as $27,000 in a single year. His assets gradually dwindled until on the 27th day of May, 1932, his assets amounted to less than $3,000, with liabilities of $4,300. During the early months of 1932 the bank became quite insistent upon payment of the balance due on the note. Kirby promised to make weekly payments of $10 per week until the note was all paid. These payments were kept up for only 3 weeks, however, when he defaulted. After waiting some weeks, defendant charged $20 against plaintiff's account in the bank, and credited that amount on plaintiff's note, and notified plaintiff of said payment. This took place on the 27th day of May, 1932. On the following morning Mr. Kirby went to the defendant bank and demanded an explanation. A rather stormy scene took place, during which plaintiff said he could not pay the note, and told defendant that, if it undertook to force payment in any way, he would go into bankruptcy, claim his exemptions, and that defendant would never get anything. Defendant immediately started an action on the note and sued out a writ of attachment.

The grounds upon which the attachment was issued as stated in the affidavit of defendant bank are:

"That the defendant has secreted, incumbered, transferred or otherwise disposed of, or is about to secrete, incumber, transfer or otherwise dispose of his stock of merchandise and other property with intent to defraud and/or delay his creditors and/or the plaintiff herein."

"And said affiant deposes and says, that said plaintiff is in danger of losing its said claim by reason of the fact aforesaid, unless a writ of attachment issue, and prays that such writ of attachment may be allowed and issued against the property of said defendant."

Motion supported by counter affidavits was made by defendant, Kirby, for dissolution of the attachment. This motion was submitted to Judge Tripp and was by him granted, and an order entered dissolving and setting aside the attachment. The bank

then applied to Judge Tripp for a rehearing on the order vacating the attachment. This motion was allowed by Judge Tripp, but, before the rehearing could be had, the defendant, Kirby, filed an affidavit of prejudice, disqualifying Judge Tripp from further participation in the case, and Judge Bakewell was called in to take his place. The motion to dissolve the attachment was then reargued before Judge Bakewell, and, after hearing such reargument, he set aside Judge Tripp's order dissolving the attachment, and reinstated the attachment. From this order the defendant, Kirby, took an appeal to this court, where the order appealed from was reversed on the ground that Judge Bakewell had no jurisdiction to review the order of Judge Tripp dissolving the attachment. See First Nat. Bank v. Kirby [1934] 62 S. D. 489, 253 N. W. 616. The effect of this decision was to leave the original order of Judge Tripp dissolving the attachment in full force. Defendant, Kirby, thereupon commenced this action for recovery of damages, both actual and exemplary, caused by the attachment.

On the trial of the case the jury awarded, and the trial court sustained, a verdict of $5,150, $2,000 of which was exemplary damages. Defendant's motion for a new trial was denied, and it appeals to this court.

Numerous assignments of error are made by appellant, but the first question to be disposed of is the sufficiency of the evidence to show want of probable cause on the part of the bank for suing out the attachment. The order of Judge Tripp dissolving the attachment, unappealed from, is sufficient to establish the wrongfulness of the attachment, but this fact alone is not sufficient to entitle plaintiff to recover in this form of action. The facts alleged in the bank's affidavit, as grounds for the issuance of the attachment, may not have existed at all, but, if the conduct of the defendant and the circumstances surrounding the case are of such a nature as to lead a reasonably fair-minded man to believe they did exist, then plaintiff is not entitled to recover; and the plaintiff has the burden of proving the nonexistence of such conduct or circumstances; or, in other words, plaintiff has the burden of proving want of "probable cause." Slaughter v. Nolan, 41 S. D. 134, 169 N. W. 232; Vander Linden v. Oster, 37 S. D. 113, 156 N. W. 911; Brown v. Keyes, 54 S. D. 596, 223 N. W. 819; Nord-

haus v. Peterson Bros., 54 Iowa 68, 6 N. W. 77; Richardson v. Dybedahl et al., 14 S. D. 126, 84 N. W. 486; 6 C. J. § 1227,

Under the rule followed in these cases it is necessary to examine the facts and circumstances as they existed, or appear to have existed, on the 28th day of May, 1932. This was so thoroughly done by Judge Bakewell in his analysis of the case, and so clearly stated by him in his order of September 26, 1932, that I can do no better than to incorporate his language in this opinion:

"I have read and re-read all of the affidavits used on the original hearing for dissolution of the attachment as well as those used on the hearing for vacation of such order of dissolution. Most of the affidavits consist of conclusions of fact and of law, but out of the whole mass of affidavit matter these facts are definitely admitted, viz:

"During the year commencing 1930 and ending June 1931 defendant deposited in the plaintiff bank approximately $15,000.00. His financial statement Exhibit 'A' shows that on June 6th, 1931, he had merchandise of the value of $13,140.00 with outstanding liabilities of $4,203.00, of which $2,500 was his indebtedness to the plaintiff bank. His financial·statement Exhibit 'B,' which purports to show his financial condition on January 1st, 1932, shows his merchandise assets as $8,712.00, or a shrinkage of merchandise of $4,428.00, and shows his bills payable as $4,003.00 or $200.00 less than the previous June and the undisputed showing by the bank is that from January 1931 to January 1st, 1932, he deposited in the bank approximately $10,000.00 out of gross sales during that period of $10,504.00. The evidence also shows that from January 1st, 1932, to the date of the attachment Kirby deposited in the bank $1,380.00. Exhibit 'A' shows defendant's total net worth on June 6th, 1931, to be $10,337.00 and seven months later on January 1st, 1932, to be $5,508.65, while on May 28th, 1932, his total assets have shrunk to less than $3,000.00 while his total liabilities exceed $4,300.00. Now, these assets were almost entirely in the form of merchandise. It is probably true that the value of the merchandise has shrunk to some extent, due to lowered wholesale cost, but while defendant has suggested this as an explanation of what has become of his admitted assets, his explanation is not of a definite nature and is, to say the least,

not convincing. It is undisputed that during this period of time defendant conducted auction sales. If we are to presume, as I think we have a right to presume, that he sold his goods at a fair and reasonable price and according to the dictates of good business, he must have received therefor a great deal more than the $1,380.00 which he deposited in the plaintiff bank. For, this much we know, that on May 28th or thereabouts, his stock of goods was worth less than $1,000.00. If he did not sell these goods, but disposed of them otherwise than by sale, it may be fairly inferred that he did so with intent to delay, if not to defraud, his creditors. If he sold the goods at a price not in accord with good business in a ruinous and unbusinesslike fashion such as to result in his realizing but $1,380.00 out of approximately $9,000.00 worth of merchandise, it would certainly be incumbent upon him to furnish some logical explanation of his reason for so doing. The whole situation suggests either one or the other of three possible occurrences. First: The stock of goods in a large amount has been removed from the store; Second; The goods have been sold at a fair and proper price and the money secreted: Third: The goods have been sold at a price far less than their true value or practically given away. Now, the affidavits submitted by defendant contain no explanation of what has happened to his assets of $14,540.00 during the passage of a single year and less, except that he admitted having received $1,380.00 in money and still has less than $1,000.00 worth of goods on hand and that there has been an inventory shrinkage due to lower prices. During this time he has kept no balance of funds in the bank, but has drawn checks on his account faster than he has deposited money therein. He has not used the proceeds of merchandise sales to discharge his bills payable, except to the extent of about $200.00. He does not claim to have paid out any money whatsoever other than this $200.00, except for living expenses. In short he offers no explanation whatsoever of what has become of his stock of goods.

"Now it is true that an attaching creditor has the burden of sustaining the allegations of this affidavit for attachment and he must establish a prima facie case. When he has established such prima facie case, if there is any explanation which the defendant can make which has the effect of destroying the prima facie

case, it is incumbent upon the defendant to make such explanation. As stated by Judge Corson in the case of Peck v. Toland, 27 S. D. 406, 131 N. W. 402, 'It will not be necessary to establish such fraudulent intent by direct evidence, but it may be gathered from the circumstances provided inferences of a fraudulent intent are fairly warranted and follow as a legal sequence of the facts proved.' Otherwise, it is not necessary that the plaintiff and attaching creditor here prove Kirby's intent to defraud them or delay them in their collections of their note by any vocal admissions or statements made by Kirby, but that intent may be inferred from all the facts and circumstances existing and where those facts and circumstances show a totally unexplained diminution of assets to a large amount, it raises a strong presumption that he was disposing of or selling his property in order to defraud his creditors. A business man engages in his business for the purpose of acquiring property. When he has acquired property he is generally most vigilant in watching it and keeping and preserving it. If it disappears from under his very eyes and its departure and absence is entirely unaccounted for, it is so contrary to natural human conduct as to create the strongest evidence of an intent to defraud creditors.

"I have read a large number of cases in which the given state of facts are considered by courts to determine whether or not the attaching creditors had cause for attachment, · or otherwise stated, had made out a prima facie case warranting a proceeding by attachment. These cases all turn on peculiar facts, but I find no case goes so far as to hold that a shrinkage of visible assets such as occurred here, would not establish a prima facie case."

As stated by Judge Bakewell, the foregoing facts are undisputed, and in my view are sufficient to show beyond question that probable cause existed.

During the trial the court over proper objection permitted the plaintiff to answer the following question: "Just in a general way, what was about the value of your business along in 1920?" This was objected to on the ground, among others, that it was too remote. This objection should have been sustained. It is not material what the value of the business was 10 years prior to the attachment or any other time than at the time of the attachment.

Plaintiff's testimony showed that his business had been dwindling for several years prior to the attachment, until at the time of the attachment, his business was not worth anything. He admitted that he was insolvent and that his debts exceeded his assets by $1,700. The effect of this question and answer was to give the jury the impression that the attachment interrupted and destroyed a $65,000 annual business, and that the jury so regarded it is clearly shown by the verdict of $5,150 returned by them. The admission of this evidence was error, for which alone the case should be reversed.

A large number of questions relating to conditions existing 10 years prior to the attachment were asked and answered over proper objection. Said questions were wholly incompetent and prejudicial to the defendant.

The same is true of the remittitur and opinion of this court on the appeal from Judge Beck's order in the attachment proceeding. These two documents were utterly incompetent for any purpose whatever, and only tended to prejudice the jury against the appellant.

The court erred in its instruction to the jury wherein he told the jury to take into consideration loss of customers, loss of credit, and loss of reputation, because there is no evidence in the record to show that plaintiff suffered loss to any amount in any of these respects nor were such damages pleaded in the complaint or made an issue in the case.

There is no evidence of malice nor lack of probable cause; therefore the question of exemplary damages was not in the case and should not have been submitted to the jury.

But, if plaintiff was entitled to recover at all, the verdict is so grossly excessive that it should be set aside on mere inspection by the court. The evidence shows, indeed it is admitted by the respondent, that he was insolvent; that he was running his store without any profit, and therefore he could not have been damaged in any substantial amount because of the interruption of his business for a period of 18 days.

The court erred in receiving in evidence Exhibits Nos. 1, 2, 3, 5, 6, 8, 10, 12, and 13. None of these exhibits were material to any issue in the case, and could not have had any other effect than

414

to prejudice the minds of the jury against the appellant. The verdict in this case is absolutely vicious. At the time of the levy of the attachment, plaintiff's business had dwindled to practically nothing. His stock of merchandise was not worth to exceed $1,000; he was not making expenses, say nothing about a profit, yet for an interruption of this business for a period of 18 days the jury gave him a verdict for $3,150 as actual damages and exemplary damages of $2,000, a total of $5,150.

The court erred in permitting an officer of the bank over proper objection to answer the following question: "And that was the time when this bank became a member of the affiliated system?" This matter was not material to any issue in the case, and was a direct appeal to the prejudice of the jury against chain systems of every kind.

Assignments Nos. 16 and 17 are predicated upon a conversation that took place between plaintiff and one of the officers of the bank. This conversation was immaterial to any issue in the case, even if it had taken place at or before the levy of the attachment, but it took place at some considerable length of time after the attachment, and could have no other effect than to prejudice the jury against the appellant.

Whether the five thousand and some dollars worth of merchandise that disappeared from Kirby's stock during the last few months prior to the attachment was sold or not does not appear in the record; nor, if sold, what became of the proceeds, Kirby never tried to explain.

The judgment and order appealed from ought to be reversed.